AO 241                                                                                              Page 2
(Rev. 12/04)

### PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
### HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: | Massachusetts | |
|---|---|---|---|
| Name (under which you were convicted):<br>Louis H. Mathews | | | Docket or Case No.: |
| Place of Confinement :<br>MCI-Norfolk | | Prisoner No.:<br>W86694 | |
| Petitioner (include the name under which you were convicted)<br>Louis H. Mathews | v. | Respondent (authorized person having custody of petitioner)<br>Gary Roden | |
| The Attorney General of the State of    Massachusetts | | | |

### PETITION

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:
      Barnstable Superior Court, Barnstable, MA

      (b) Criminal docket or case number (if you know):    04-00116

2.    (a) Date of the judgment of conviction (if you know):    December 2, 2005

      (b) Date of sentencing:    December 2, 2005

3.    Length of sentence:    Life, without parole

4.    In this case, were you convicted on more than one count or of more than one crime?    ☐ Yes   ☒ No

5.    Identify all crimes of which you were convicted and sentenced in this case:
      First degree murder

6.    (a) What was your plea? (Check one)

                    ☒ (1)    Not guilty        ☐  (3)    Nolo contendere (no contest)
                    ☐ (2)    Guilty            ☐  (4)    Insanity plea

AO 241 Page 3
(Rev. 12/04)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did

you plead guilty to and what did you plead not guilty to?

N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

     ☒ Jury   ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

     ☐ Yes  ☒ No

8.  Did you appeal from the judgment of conviction?

     ☒ Yes  ☐ No

9.  If you did appeal, answer the following:

(a) Name of court:    Massachusetts Supreme Judicial Court

(b) Docket or case number (if you know):  S.J.C. No. 09716

(c) Result:  Affirmed

(d) Date of result (if you know): March 21, 2008

(e) Citation to the case (if you know):  Commonwealth v. Mathews, 450 Mass. 858 (2008)

(f) Grounds raised:

  See Attached Sheet

(g) Did you seek further review by a higher state court?  ☐ Yes  ☒ No

    If yes, answer the following:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Result:

    (4) Date of result (if you know):

**9(f) GROUNDS RAISED**

I. THE INTRODUCTION OF INCONCLUSIVE DNA EVIDENCE IN AN ATTEMPT TO LINK THE DEFENDANT TO THE MURDER WAS PREJUDICIAL ERROR CONSTITUTING A SUBSTANTIAL LIKELIHOOD OF A MISCARRIAGE OF JUSTICE REQUIRING THE CONVICTION TO BE VACATED AND A NEW TRIAL ORDERED

IA: THE INTRODUCTION OF INCONCLUSIVE DNA EVIDENCE WAS ERROR

IB: SUBSTANTIAL LIKELIHOOD OF A MISCARRIAGE OF JUSTICE

IC: INEFFECTIVE ASSISTANCE OF COUNSEL

II. IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO FAIL TO MOVE TO DISMISS THE INDICTMENTS WHERE THE COMMONWEALTH IMPAIRED THE INTEGRITY OF THE GRAND JURY THROUGH PRESENTATION OF IMPROPER EVIDENCE

IIA: ADVISING THE GRAND JURY THAT THE DEFENDANT REFUSED TO CONTINUE THE INTERVIEW AND THE AND THAT HE WANTED TO SPEAK TO AN ATTORNEY VIOLATED HIS ARTICLE 12 AND FIFTH AMENDMENT RIGHTS

IIB: THE COMMONWEALTH KNOWINGLY PROVIDED FALSE AND DECEPTIVE EVIDENCE TO THE GRAND JURY

IIC: THE COMMONWEALTH WITHHELD EXCULPATORY EVIDENCE THAT WOULD LIKELY HAVE AFFECTED THE GRAND JURY'S DECISION

IID: THE VERDICT AT TRIAL DOES NOT IMUNIZE THE GRAND JURY PROCEEDINGS FROM REVIEW

IIE: FAILURE TO MOVE TO DISMISS THE INDICTMENTS DUE TO IMPAIRMENT OF THE INTEGRITY OF THE GRAND JURY CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

III. IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO FAILE TO MOVE TO SUPRESS AN-IN-CUSTODIAL STATEMENT GIVEN WITHOUT BENEFIT OF MIRANDA WARNINGS WHICH ALSO TAINTED THE DEFENDANT'S SUBSEQUENT STATEMENT

IIIA: BOTH THE UNWARNED STATEMENT AND THE SUBSEQUENT TAINTED STATEMENT SHOULD HAVE BEEN SUPPRESSED

IIIB: FAILURE TO MOVE TO SUPRESS THE STATEMENTS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

CONCLUSION

(5) Citation to the case (if you know):    N/A

(6) Grounds raised:    N/A

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes    ☒ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions
concerning this judgment of conviction in any state court?    ☒ Yes    ☐ No

11.  If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court:  Barbstable County Superior Court

(2) Docket or case number (if you know):  04-00116

(3) Date of filing (if you know):    May 30, 2006

(4) Nature of the proceeding:  Motion for New Trial

(5) Grounds raised:  See Attached Sheet

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☒ No

(7) Result: Denied August 25, 2996

(8) Date of result (if you know):

**11(a)(5) GROUNDS RAISED**

I.    THE COMMONWEALTH IMPAIRED THE INTEGRITY OF THE GRAND JURY
THROUGH PRESENTATION OF IMPROPER EVIDENCE

IA:  ADVISING THE GRAND JURY THAT THE DEFENDANT REFUSED TO CONTINUE THE
INTERVIEW AND THAT HE WANTED TO SPEAK TO AN ATTORNEY VIOLATED HIS
ARTICLE 12 AND HIS FIFTH AMENDMENT RIGHTS

IB:  THE COMMONWEALTH KNOWING PROVIDED FALSE AND DECEPTIVE EVIDENCE TO THE
GRAND JURY

IC:  THE COMMONWEALTH WITHHELD EXCULPATORY EVIDENCE THAT WOULD LIKELY HAVE
AFFECTED THE GRAND JURY'S DECISION

ID:  THE VERDICT AT TRIAL DOES NOT IMUNIZE THE GRAND JURY PROCEEDINGS FROM
REVIEW

II.  THE FAILURE TO MOVE TO DISMISS THE INDICTMENTS DUE TO IMPAIRMENT OF
THE INTEGRITY OF THE GRAND JURY CONSTITUTED INEFFECTIVE ASSISTANCE
OF COUNSEL

CONCLUSION

AO 241
(Rev. 12/04)

Page 5

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:   Barnstable County Superior Court

(2) Docket or case number (if you know):   04-00116

(3) Date of filing (if you know): March 10, 2009

(4) Nature of the proceeding: Motion for New Trial

(5) Grounds raised:   See Attached Sheet

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result:   Denied

(8) Date of result (if you know):   May 27, 2009

(c) if you filed any third petition, application, or motion, give the same information:   N/A

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

**11(b)(5) GROUNDS RAISED**

1. THE FAILURE OF BOTH THE PROSECUTION AND THE DEFENSE TO PRESENT EXISTING EVIDENCE THAT BLOOD IDENTIFIED NEAR THE TUB DRAIN AT 28 WAMPANOAG DRIVE COULD NOT HAVE COME FROM THE VICTIM, AND THE PROSECUTOR'S ARGUMENT IMPLYING THAT THE VICTIM WAS THE SOURCE OF THAT BLOOD, GAVE RISE TO A SUBSTANTIAL MISCARRIAGE OF JUSTICE.

2. THE PROSECUTION'S FAILURE TO PERFORM POTENTIALLY EXCULPATORY FORENSIC TESTING AND DEFENSE COUNSEL'S FAILURE TO REQUEST THE TESTING GAVE RISE TO A SUBSTANTIAL RISK OF A MISCARRIAGE OF JUSTICE

-1-

AO 241
(Rev. 12/04)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☐ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:    ☒ Yes    ☐ No

(2) Second petition:    ☒ Yes    ☐ No

(3) Third petition:    ☐ Yes    ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attached Sheet

(b) If you did not exhaust your state remedies on Ground One, explain why:

This Ground was exhausted to the Massachusetts Supreme Judicial Court

12(a) GROUND ONE:

THE INTRODUCTION OF INCONCLUSIVE DNA EVIDENCE IN ATTEMPT TO LINK
THE DEFENDANT TO THE MURDER WAS PREJUDICIAL ERROR CONSTITUTING A
SUBSTANTIAL LIKELIHOOD OF A MISCARRIAGE OF JUSTICE REQUIRING THE
CONVICTION BE VACATED AND A NEW TRIAL ORDERED.

IA: THE INTRODUCTION OF INCONCLUSIVE DNA EVIDENCE WAS ERROR

The Commonwealth introduced substantial DNA evidence all of which was

negative in linking Mr. Mathews and the victim, Mr. Turner, or was inconclusive.

This evidence included blood swabs from Mr. Mathews shorts, his hands, and under

his fingernails. The DNA expert testified that "Inconclusive" in this context

meant there was "not enough DNA in order to make a conclusion, either an in-

clusion or an exclusion..." Nonetheless, the prosecutor argued in closing that:

> the DNA did not exclude Scott Turner as possibly a potential
> contributor to the DNA on the Defendant's hands. They simply said
> there wasn't enough to confirm that. But it was not an exclusion.
> And remember during your deliberations because this is important.

The prosecutor's closing argument was improper; it misused the DNA

evidence. His argument was not based on the evidence and invited the jury

to speculate.

The SJC discussed the admissibility of DNA evidence. The SJC, after deciding

that DNA evidence was admissible noted that:

> [i]t is apparent from the basis on which we decide the DNA testing
> issue that we would not permit the admission of test results showing
> a DNA match (a positive result) without telling the jury anything
> about the likelihood of that match occuring. Of course, evidence of
> the absence of a match ( a negative result) could properly be admitted
> without any need for a showing of the likelihood of a match occuring.
> In certain circumstances, the results of a DNA test may be incon-
> clusive. If so, the sonsequences of the test are inadmissible.

The restrictions on, or regulation of, the admissibility of DNA evidence

announced in Curnin, were justified in other SJC decisions in 1991, "because

evidence of this character has too great a potential for affecting a jury's

judgment,".

While the prosecution did not attach a statistical probability to the

"inconclusive" DNA results as including either the victim or the Defendant, the

-1-

entire point of such evidence was to suggest that there was scientific evidence
that such a linkage was probable. Indeed, the prosecution argued that the DNA
results of the blood swabs from the Defendant's hands did not exclude the victim.
The suggested inference was that since "scientifically" the DNA tests did not
exclude the victim, the jury could infer that they "probably" included his DNA.
That inference would be improper, since "inconclusive" means there was insuffic-
ient DNA to make any conclusions. It was nevertheless the conclusion for which
the prosecutor argued. The argument was imporper because it was speculative and
"because evidence of this character has too great a potential for affecting a
jury's judgment.

      That same logic is reflected by the SJC, that:

            [w]here courts are commentators have been reluctant to admit
            statistical evidence, that reluctance has stemmed largely from
            the fact that the probabilities on which the evidence depended
            were based on mere speculation or were characterized in such a
            way as to mislead or confuse the jury.

      The DNA results in the instant case did not contain enough information to
reach any conclusions about the contributors. Those results must be contrasted
with the situation in which, although not specifically identifying a person, DNA
testing provides credible information for statistical calculations and probabilities
that are sufficiently reliable to provide admissible relevant evidence. Mr.
Matthew's objection is not to "probabilistic" evidence, but to the lack of any
reliable, established scientific basis for the use of such evidence. The results
here were inadequate to provide any reliable information upon which to base a
judgement about the contributors. Thus, the evidence was "Based on mere specula-
tion" and was "characterized in such a way [in argument] as to mislead or confuse
the jury."

      Those cases in which the SJC has approved the admission of evidence of the
presence of blood that was inconclusive with regard to its source, are inopposite.

      However, in none of those cases was the identity of the source of blood
"suggested" by packaging the evidence within the persuasive, scientific context

-2-

of DNA. That is, here, the prosecutor went beyond merely introducing evidence that the defendant had blood on his hands; he argued via the science of DNA that the jury could infer it was the victim's. The inconclusive DNA results were inadmissible. They were speculative and irrelevant, and their potential for misuse and prejudice was high. It was error to admit the inconclusive results of the DNA tests.

This Petitioner would like to make this U.S. District Court aware that when the SJC was deciding this case they were using transcripts that were in error, we now have the corrected transcripts, where they are major differences when it comes to DNA evidence, both post-conviction counsel's were made aware of this potentially huge error and did nothing about it. It was the Petitioner himself who got the corrected transcripts, which will be discussed at a later time in this application.

IB:   SUBSTANTIAL LIKELIHOOD OF A MISCARRIAGE OF JUSTICE

Admission of the DNA evidence created a substantial likelihood of a mis-carriage of justice, which is the standard of review in first degree murder cases where, as here, no objection was preserved at trial. This case meets that test.

The Commonwealth's evidence against the Defendant was not overwhelming. There were not witnesses to the incident. There was no evidence linking the Defendant directly to the crime. The victim and Mr. Mathews were friends, and there was no apparent motive for the crime. Ms. Turner testified that Mr. Mathews woke her up around midnight and said he wanted her help because he was going to "kill her brother." However, the stipulated testimony of the bartender was that Mr. Mathews and the victim were still at the Dino's bar at 12:45 a.m. Thus he could not have spoken to Ms. Turner at midnight and the Commonwealth's attempt to link Mr. Mathews to the victim's death fails.

There was also testimony that two people were heard arguing on Ninigret Ave.

-3-

at about 1:00 a.m. The victim was identified as one of the men, but there was no definitive identification of the Defendant as the other. Again the Common-wealth's attempt to link Mr. Mathews to the victim's death fails.

There was evidence of blood on the Defendant's hands, shorts, the chair in which he had been sitting and in the bathroom of his wife's house where he showered. It was established that Mr. Mathews had reinjured his nose, which he had cut several days earlier, and that it was bleeding on June 23rd which could have accounted for the blood. There was, then, no compelling linkage between Mr. Turner's death and Mr. Mathews. The Commonwealth attempted to bridge this gap with the "inconclusive" DNA evidence. The prosecutor's argument was pointed, purposeful and clear. He argued that "the DNA did not exclude Scott Turner as possibly a potential contributor to the DNA on the defendant's hands." However, given the DNA expert's testimony that "inconclusive" in this context meant there was "not enough DNA in order to make a conclusion, either an inclusion or an exclusion...,", that argument was improper, misleading and a distortion of the evidence.

The prosecutor attempted to use the inconclusive DNA evidence to provide the missing link between Mr. Mathews and the death of Scott Turner. It was encased with the aura of scientific evidence: objective, reliable, believable. But, it was none of those things. The DNA evidence was speculative, irrelevant and inadmissible. It is precisely because such evidence has the aura of science wrapped about it, that it is excluded, "because evidence of this character has too great a potential for affecting a jury's judgment. Admission of this evidence is quintessentially the type of error that was "likely to have influenced the jury's conclusion."

## IC:    INEFFECTIVE ASSISTANCE OF COUNSEL

Trial counsel failed to object to the introduction of the inconclusive DNA evidence. Admission of the evidence was prejudicial error resulting in a sub-stantial likelihood of a miscarriage of justice. There could be no tactical reason for allowing this evidence to be introduced, i.e., the match between DNA

on Mr. Doughtery's shirt and DNA beneath the victim's fingernails, could have been elicited without allowing the inconclusive DNA results to be introduced.

The SJC has stated:

> [i]n evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we begin by determining whether there was a serious failure by trial counsel. If so, then we determine whether the failure resulted in a substantial likelihood of a miscarriage of justice.

To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that "there was an error in the course of the trial [that was] likely to have influenced the jury's conclusion." The court's focus us on the effect of the error and not defense counsel's adequacy. The standard of review for both unpreserved claims and ineffectiveness claims is the same in a direct appeal from a first degree murder conviction per MGL c. 278 §33E: whether the error constituted a substantial likelihood of a miscarriage of justice.

Mr. Mathews has demonstrated that admission of the inconclusive DNA evidence was error and that it resulted in a substantial likelihood of a miscarriage of justice. Such evidence is excluded precisely "because evidence of this character has too great a potential for affecting a jury's judgment." That conclusion applies here. The Commonwealth's case was not overwhelming, and the erroneously admitted inconclusive DNA evidence supplied the link between the Defendant and the crime which the Commonwealth needed to prove its case. There can be no doubt that the improperly admitted DNA evidence "influenced the jury's conclusion." Trial counsel's failure to object to admission of this evidence constituted ineffective assistance of counsel and a new trial must be ordered.

-5-

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐     Yes     ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

Presented to the SJC in direct appeal.

**GROUND TWO:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attached Sheet

(b) If you did not exhaust your state remedies on Ground Two, explain why:

This issue was exhausted on diect appeal to the SJC

(c)    **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐   Yes    ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

12(a) GROUND TWO:

II   IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO FAIL TO MOVE TO DISMISS THE
     INDICTMENTS WHERE THE COMMONWEALTH IMPAIRED THE INTEGRITY OF THE GRAND
     JURY THROUGH PRESENTATION OF IMPROPER EVIDENCE

     Mr. Mathews filed a motion for new trial, asserting that the Commonwealth

impaired the integrity of the Grand Jury. And that failure to move to dismiss

the indictments of this ground constituted ineffective assistance of counsel.

The lower court denied the motion without opinion. The SJC did offer an

opinion that this Petitioner disagress with.

### IIA:   ADVISING THE GRAND JURY THAT THE DEFENDANT REFUSED TO CONTINUE THE
          INTERVIEW AND THAT HE WANTED TO SPEAK TO AN ATTORNEY VIOLATED HIS
          ARTICLE !@ AND HIS FIFTH AMENDMENT RIGHTS

     Admission of evidence that a defendant refused to provide information or

other evidence to the police violates his constitutional privilege against

self incrimination. This would include informing a grand jury that a suspect

exercised his right to remain silent and to speak to an attorney.

     Detective Waterfield of the Mashpee police told the grand jury that

following the officers' asking Mr. Mathews if he had encountered a problem with

the victim the prior night and had to use self-defense to protect himself. Mr.

Mathews "did not utter anything to us and it was right after that, that he said

to us that he needed to talk to a lawyer." A few moments later, Detective

Waterfield testified, in response to a question from the prosecutor, that he

informed Mr. Mathews that his hands tested positive for blood, and that at that

point the interview terminated. Detective Waterfield's testimony was false, as

will be shown in Point IIB, infra.

     The clear inference the Commonwealth wanted the grand jury to draw was

that once Petitioner was confronted with the responsibility for the victim's

death or with inculpatory evidence, he feared self-incrimination and refused

to speak further to the officers and asked for a lawyer. The SJC has stated:

-1-

> [w]e have also recognized that evidence of a defendant's
> refusal to comply with a police request may not be admitted
> because in so refusing a defendant furnishes evidence against
> himself, and admission of that evidence would violate
> art. 12.

Advising the grand jury that Petitioner invoked his right to silence and
to an attorney was, in effect, using the invocation of those rights against
him. Such information should not have been provided to the gran jury. A
defendant's refusal to speak with the police, as well as his request for an
attorney cannot be introduced at trial, nor can comment be made upon those
choices. The Commonwealth was using Petitioner's invocation of his rights to
silence and his right to an attorney against Petitioner as evidence of
consciousness of guilt.

There are situations in which comment on the right to silence is admissible.
In the present case, there was no evidence of any confusion, nor was anything
done by the Petitioner to cause any. The prosecutor deliberately presented the
fact of Petitioner's invocation of his rights to the grand jury. The situation
is governed by case law, where officers testified at trial that the defendant
initially spoke to them, but when the officers said they doubted his story, the
defendant invoked his right to silence. The SJC held that there was "no evidence
of juror confusion, and the defendant did nothing that could arguably be said
to create such confusion as in other case law. The SJC has held that even if
juror confusion did exist, it was unnecessary for the officers to testify to
the reason the interview was terminated. The SJC concluded that the officer's
testimony violated the rule of Supreme Court case law.

Here, there was no evidence of grand jury confusion. The testimony came
during the officer's recitation of his questioning Mr. Mathews as to whether
he had fought with the victim and that "he should explain that to us, and he
refused".

-2-

The prosecutor continued questioning the officer regarding forensic test results, and whether those results were given to Petitioner prior to termination of the interview. But for the officer's statements about Petitioner's invocation of his rights to silence and counsel, the grand jury would not have known the circumstances under which interview had terminated. There was no grand jury confusion and no abrupt end to the interview which needed explanation. The statements regarding Petitioner's invocation of his constitutional right to silence and an attorney were interjected into grand jury testimony solely to raise an inference of his consciousness of guilt. That violated Mr. Mathews' federal and state constitutional rights.

The officer's testimony that Petitioner refused to "explain" any self-defense issue to them, also violated Article 12 injunction against intorducing refusal evidence.

## IIB:   THE COMMONWEALTH KNOWINGLY PROVIDED FALSE AND DECEPTIVE EVIDENCE TO THE GRAND JURY

The standard for evaluating the presentation of false or deceptive evidence to a grand jury is as follows:

> [t]o sustain a claim that the integrity of the grand jury proceeding has been impaired, not only must the evidence have been given with knowledge that it was false or deceptive, but the false or deceptive evidence must probably have been significant in the view of the grand jury and must have been presented with the intention of obtaining an indictment.

Petitioner asserts that those requirements have been met here.

### KNOWINGLY FALSE AND DECEPTIVE EVIDENCE

In the Grand Jury, the prosecutor asked Detective Waterfield, whether the results of the swabbing of Petitioner's ahnds were available prior to the termination of his interview with him. Detective Waterfield answered in the affirmative and stated that the results were positive for blood. The prosecutor then asked whether Petitioner was advised of the results and whether the interview was terminated at that point. Detective Waterfield dutifully answered in the

-3-

affirmative to both questions. All of that evidence was false.

The police report of the interview states that at "1113 hours" during the interview, the police received the results of testing done on a bathtub at Petitioner's wife's house. The results were positive for blood. Petitioner was advised of the results, and was also told that his clothing would be tested. Petitioner responded: "I better talk to an attorney this is serious, murder, I need an attorney." That is when the interview ended. That was shortly after 1113 hours. Petitioner's hand(s) were not swabbed until 1400 hours, following issuance of a search warrant. The sequence of events is established by the search warrant return and the affidavit for and arrest warrant for Mr. Mathews.

Detective Waterfield, was one of the two officers who conducted the interview, so he had personal knowledge of the sequence of events, and what Petitioner was told. He knew his testimony was false. It is reasonable to assume that the prosecutor had reviewed all the police reports, and the reports from the chemist regarding the testing and the dates thereof. Thus, he had to know the testimony was false.

The second item of false testimony came in response to questions from a grand juror. The exchange was as follows:

Juror:      But Mathews never explained how the blood got on his
            hands or why he was washing the shorts?

WITNESS:    (Waterfield): No.

JUROR:      He wouldn't give any answers to any of that information?

WITNESS:    No.

The police report shows that Petitioner was never asked about blood on his hands, and that no one knew he had blood on his hands during the interview. Furthermore, Petitioner gave an explicit account as to why he was washing his shorts. He stated that they were covered in BBQ sauce and grease and that he rinsed them in the shower. Again, since Detective Waterfield was present at the interview he had to know of Petitioner's statement and that his own testimony was false.

Detective Waterfield's statement were intended to demonstrate to the grand jurors Mr. Mathews' consciouness of guilt, in order to induce the grand jury to return an indictment of murder. His testimony was significant in securing the indictment because there was no direct evidence that Petitioner was involved in the crime. Detective Waterfield's false testimony regarding the blood on Petitioner's hands comprises two and one half pages of a total of nine pages of transcript of his grand jury testimony. Questions from the grand jury regarding the blood on Petitioner's hands constituted almost a page of that testimony. This was the only evidence which drew questions from the grand jury, and the tone of their questions clearly indicate the impact of Detective Waterfield's testimony.

Petitioner's situation is similar to that in other SJC decisions, in which the court ordered indictments dismissed due to impairment of the integrity of the grand jury. Detective Waterfield omitted Petitioner's explanation as to why he rinsed out his shorts. Detective Waterfield falsely told the grand jury that Petitioner terminated the interview when he was told blood had been found on his hands. More pointedly, after Detective Waterfield testified that Petitioner had admitted to washing his shorts, and that he had been told blood was found on his hands, a grand juror asked "He wouldn't give any answers to any of that information?" and Detective Waterfield falsely answered "no". Because of Detective Waterfield's false testimony, the grand jury could reasonably have concluded that Petitioner's failure to provide an explanation was because he was involved in the murder, and that, his silence in the circumstances would be inconsistent with innocence."

Here the integrity of the grand jury was impaired and the indictments should be dismissed. Trial counsel's failure to move to dismiss the indictments on these grounds constitutes ineffective assistance of counsel. Clearly, "better work [of

-5-

counsel] might have accomplished something material for the defense." It is more likely than not that this evidence "influenced the grand jury's conclusion, and without it no indictment may have been issued.

## IIC:   THE COMMONWEALTH WITHHELD EXCULPATORY EVIDENCE THAT WOULD LIKELY HAVE AFFECTED THE GRAND JURY'S DECISION

Blood evidence was significant to the Commonwealth's attempt to link Petitioner to the crime. The police and the prosecutor made mush of the alleged blood on the Petitioner's hands, and the blood on the tub and rug in the bath room of Petitioner's extranged wife. That evidence was presented as the only blood discovered. But the prosecutor had evidence that blood found on the shirt worn by Wayne Dougherty, the victim's sister's boyfriend, the morning of the incident. Evidence of the blood on Mr. Dougherty's shirt would likely have affected the grand jury's decision had it been presented.

While a prosecutor is not required "in all instances to bring exculpatory evidence to the attention of grand juries," he is reqiured to present exculpatory "evidence likely to affect the grand jury's decision." Although the evidence regarding blood on Mr. Dougherty's shirt, by itself, may not have had the requisite significance, in combination with the other evidence discussed above, it assumed that significance as the cumluative affect of the improper evidence took its tool on the integrity of the grand jury.

## IID:   THE VERDICT AT TRIAL DOES NOT IMMUNIZE THE GRAND JURY PROCEEDINGS FROM REVIEW

There appears to be some tension in Massachusetts law regarding the effect a guilty verdict on a claim of grand jury impairment. This being said is a good federal issue and will be presented in Petitioner's Memorandum of Law In Support of his Petition for Habeas Corpus Relief, as most of this issue deals strictly with case law and not explanation of the issue itself.

-6-

**IIE:   FAILURE TO MOVE TO DISMISS THE INDICTMENTS DUE TO IMPAIRMENT OF
THE INTEGRITY OF THE GRAND JURY CONSTITUTED INEFFECTIVE ASSISTANCE
OF COUNSEL**

Detective Waterfield's false and deceptive testimony, combined with his
advising the grand jury that Petitioner terminated the interview by invoking
his constitutional rights to silence and an attorney impaired the integrity
of the gran jury. There can be no tactical reason for trial counsel's failing
to move to dismiss the indictment due to such impairment.

The SJC has stated:

> [i]n evaluating a claim of ineffective assistance of counsel in a
> case of murder in the first degree, we begin by determining whether
> there was a serious failure by trial counsel. If so, then we
> determine whether the failure resulted in a substantial likelihood
> of a miscarriage of justice.

To prevail on an ineffective assistance of counsel claim, a defendant must
demonstrate that "there was an error in the course of the trial [that was]
likely to have influenced the jury's conclusion." The court's focus is on the
effect of the error and not counsel's adequacy. Pursuant to this standard of
review, a court considers "a defendant's claim even if the action by trial
counsel does not "constitute conduct falling 'measurably below' that of an
'ordinary fallible lawyer'.

Petitioner has demonstrated that Detective Waterfield's testimony impaired
the integrity of the grand jury. Where his testimony was not blantantly false,
and at times it was, it was deceptive. Detective Waterfield also inproperly
advised the grand jury that Petitioner exercised his rights to silence and to
and attorney. Detective Waterfield did so for the express purpose of obtaining
the indictment. The Commonwealth compounded the problem by withholding excul-
patory evidence from the grand jury. Trial counsel's failure to move to dismiss
the indictments in these circumstances, constitutes a "serious failure by trial
counsel, which resulted in the case proceeding to trial on a constitutionally
defective indictment. Clearly, "better work might have accomplished something

-7-

for the defense." Trial counsel was not effecting a strategic or tactical maneuver, he simply failed to do what should have been done. Since the focus is on the nature and effect of the error itself and not on counsel's inadequacy, the arguments raised in Point I, supra, suffice to establish the ineffectiveness claim. Thus Habeas Corpus Relief must be granted, this is only fair and just.

-8-

✎AO 241
(Rev. 12/04)

Result (attach a copy of the court's opinion or order, if available):

| | Yes | | No |
|---|---|---|---|
| (3) Did you receive a hearing on your motion or petition? | ☐ Yes | ☐ No |
| (4) Did you appeal from the denial of your motion or petition? | ☐ Yes | ☐ No |
| (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? | ☐ Yes | ☐ No |

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you : have used to exhaust your state remedies on Ground Two

Presented to SJC in direct appeal

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attached Sheet(s)

(b) If you did not exhaust your state remedies on Ground Three, explain why?

Ground III was exhausted to the Massachusetts SJC

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     x☒x Yes      ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)     **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐     Yes     x☒x No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

| | | | |
|---|---|---|---|
| (3) Did you receive a hearing on your motion or petition? | ☐ Yes | ☐ No |
| (4) Did you appeal from the denial of your motion or petition? | ☐ Yes | ☐ No |
| (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? | ☐ Yes | ☐ No |

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

III  IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO FAIL TO MOVE TO
SUPPRESS AN IN-CUSTODIAL STATEMENT GIVEN WITHOUT BENEFIT OF
MIRANDA WARNING WHICH ALSO TAINTED THE DEFENDANT'S SUBSEQUENT
STATEMENT

The standard of review in first degree murder cases where no objection

to evidence was made at trial is whether the error constituted a substantial

likelihood of a miscarriage of justice. ("Whether the error was likely to

have influenced the jury's conclusion.") This is the MGL c. 278, 33E

standard which applies as well to a defendant's claim of ineffective

assistance of counsel whether or not it was raised in a motion for a new

trial.

IIIA:  BOTH THE UNWARNED STATEMENT AND THE SUBSEQUENT TAINTED STATEMENT
SHOULD HAVE BEEN SUPPRESSED

Following Petitioner's arrest on an outstanding unrelated warrent, he

was taken to the Masphee police station, secured in an interrogation room

and questioned. He was questioned by two officers: State Police officer

Cosgrove, and Masphee officer Waterfield. At trial, Trooper Cosgrove

testified that Petitioner was given his Miranda rights and then told that

the police wanted to talk to him about something other than the matter

related to the warrant. Petitioner responded that "he thought that." That

statement was repeated by the prosecutor in his closing argument, as

establishing consciousness of guilt.

However, in his police report, Trooper Cosgrove wrote that after Mr.

Mathews was taken into the interview room, he was told that they wanted to

speak with him "regarding something other than the warrant." Mr. Mathews

replied that he "figured that" and agreed to speak with them. Only then did

the police give Mr. Mathews his Miranda warnings. A lengthy interview

followed.

Petitioner's statement was clearly a testimonial communication subject

to Fifth Amendment protections. A testimonal communication is one which, by itself, "explicitly or implicitly, relates a factual assertion or discloses information. Here, the questionung was "an invitation to relate a factual assertion or disclose information. Failure to give Miranda warnings prior to eliciting this statement requires its suppression.

In his question to Mr. Mathews, Trooper Cosgrove was inviting Mr. Mathews to disclose that he knew of the victim's death and that he was involved in it. This was incriminating in that the murder had occured only hours earlier, and it was unlikely that someone uninvolved would have knowledge of it. This seemingly innocuous statement, similar to the "what time did you leave for work" question, in other case law, was in reality incriminating.

The constitutional bar to the use of unwarned statements applies to "consciousness of guilt" statements. There is no doubt that the Commonwealth considered the statement to be evidence of consciousness of guilt. The prosecutor elicited this statement at trial, and highlighted it in closing argument. Since the statement was made in the absence of Miranda warnings, it must be suppressed.

The more complex question, however, is whether the Petitioner's subsequent statement should also have been suppressed. Two independent lines of inquiry are available for analyzing this issue. The Commonwealth has the burden of proof on both. First, the court may determine whether there was a "break in the stream of events" between the unwarned statement and the subsequent, warned statement. The absence of a break condemns the second statement as well. In the instant case "both statements were the result of a single continuous interrogation". The first, illegal statement arguably expressed an awareness of the victim's death a few hours after the incident, before the police explicitly made Mr. Mathews aware of it. This statement, "constituted strong evidence of consciousness of guilt." Continuing the

-2-

interrogation without "affording the defendant a break in the stream of events" was error requiring suppression of the second tainted, though warned statement.

The second line of analysis evaluates whether the first statement let "the cat out of the bag" thereby adversely affecting the second statement. This question turns on whether the police were aware that the defendant's unwarned statement was incriminatory. If a defendant makes an unwarned statement that the police realize is incriminating, even though the defendant thought it exculpatory, the police must then provide Miranda warnings and must also "create a break in the stream of events to insulate any later state-ment from the taint or the prior illegality." Failure to do so requires suppression of the second statement as well as the frist.

Here, the first statement was inculpatory as strong consciousness of guilt, or admission of knowledge of the victim's death in circumstances in which Mr. Mathews should not have had such knowledge. The police knew that, which is why they posed the issue. Both officers were then obligated to administer Miranda warnings and to provide a sufficient break in the stream of events so as to eliminate the taint of that unwarned statement on the subsequent one. Since no break was provided, the second statement must be suppressed.

## IIIB: FAILURE TO MOVE TO SUPPRESS THE STATEMENTS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

Since trial counsel did not move to suppress Mr. Mathews' statements, the SJC reviews for a substantial likelihood of a miscarriage of justice.

"The failure of counsel to litigate a viable claim of an illegal search and seizure is a denial of the defendant's Federal and State Constitutional right to the effective assistance of counsel." A defendant must establish "a likelihood that the motion to suppress would have been successful."

Petitioner has demonstrated above that it was a "serious failure" for

-3-

trial counsel to fail to move to suppress his statements and that suppression would likely have been successful. Trial counsel's failure to file a motion could not have been a tactical decision since there was no reason not to file such a motion, and introduction of Mr. Mathews' statements was prejudicial. Trooper Cosgrove testified to the contents of the second statement in detail. The prosecutor then used the initial, unwarned statement as consciousness of guilt evidence to support his argument that Mr. Mathews fabricated his story. The prosecutor stressed the inconsistencies and contradictions between Mr. Mathews' account and other evidence at trial. There is no doubt as to its prejudicial nature.

The Commonwealth's evidence was circumstantial. There were no witnesses to the incident. There was no forensic evidence directly linking Mr. Mathews to the murder. The prosecutor made Mr. Mathews a main witness against himself through the introduction of his statements. There was, then, a substantial likelihood of a miscarriage of justice wrought by trial counsels failure to move to suppress Petitioner's statements, which were "likely to have influenced the jury's conclusion." Trial counsels failure to move to suppress Petitioner's statements constituted ineffective assistance of counsel, habeas corpus relief must be granted.

-4-

✎AO 241
(Rev. 12/04)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

This issue was exhausted on direct appeal to the Massachusetts SJC

### GROUND FOUR:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attached Sheet(s)

(b) If you did not exhaust your state remedies on Ground Four, explain why:

This claim was exhausted to the Massachusetts SJC

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    x☒x Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

x☒x Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Motion for New Trail, appeal to the Single Justice

AO 241
(Rev. 12/04)

Name and location of the court where the motion or petition was filed:
Barnstable County Superior Court

Docket or case number (if you know):   04-00116

Date of the court's decision:   May 27, 2009

Result (attach a copy of the court's opinion or order, if available):

denied, the motion was denied without a hearing and without entering findings and rulings.

(3) Did you receive a hearing on your motion or petition?                  ☐ Yes   x☒x No

(4) Did you appeal from the denial of your motion or petition?             x☒x Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? x☒x Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Supreme Judicial Court For Suffolk County, the Single Justice

Docket or case number (if you know): SJ-2009-0307

Date of the court's decision:   10/19/09

Result (attach a copy of the court's opinion or order, if available):

the issue of appela to the Single Justice was denied, with no written finding of fact.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

None are available

IV. (A)   THE FAILURE OF BOTH THE PROSECUTION AND THE DEFENSE TO PRESENT
EXISTING EVIDENCE THAT PROVED THAT BLOOD IDETIFIED NEAR THE TUB
DRAIN AT 28 WAMPANOAG DRIVE COULD NOT HAVE COME FROM THE VICTIM,
AND THE PROSECUTOR'S ARGUMENT IMPLYING THAT THE VICTIM WAS THE SOURCE
OF THAT BLOOD GAVE RISE TO A SUBSTANTIAL RISK OF A MISCARRIAGE OF
JUSTICE

DNA testing was performed on the swabbing of the blood near the tub drain
at 28 WAmpanoag Drive, the address where Petitioner was arrested. The analysis
revealed that Mathews was a potential contributor to the DNA on the swabs from
the tub, but that Scott Turner could not have been a source of the DNA from
the swab. This finding was significant for its tendency to demonstrate that the
blood identified at various locations where Mathews was present on the night of
the homicide was not Turner's but his own. As stated, Mathews had a fresh cut on
the bridge of his nose. Nothing in the case tended in any way to sjow that, that
the blood in the various locations where Mathews was on the night of the homicide
was Turner's as opposed to his own.

The jurors heard that several items with which Mathews came into contact –
the ottoman by the chair where Mathews slept (at the Turner home), the shorts he
wore, the truck in which he rode, and the tub in which he later showered – all
tested positive for blood. They heard that the test results were inconclusive on
most of these items, but never heard that Turner could not have been the source
of the blood by the bath tub drain. This omission made it far more likely that the
jurors would infer that the other blood stains, for which DNA testing was incon-
clusive, constituted a trail of Turner's blood leading to the house where the tub
was located and Mathews qas arrested.

The prosecutor took advanatge, in closing argument, of the omission, He
argued as follows:

Then you have the blood evidence, And again, you heard the testimony
from the chemists, the presumptive testing being positive for blood, positive
on the passenger seat of Mike Mayne, on the floor of the passenger's seat
of Mike Mayne's truck, the tub at Wampanaog Drive, the ottoman where Linda
Turner observes the defendant to be sitting that morning when she gets up.

-1-

And then you hear that it was later analyzed at a higher level. Carol Courtwright confirms the blood on the street to be human blood, the blood in the blood spatter are to be human blood, all the way along the drag trail, as well as in the tub, on the defendant's jeans, as well as the defendant's that test positive for presumptive testing.

Clearly the prosecutor's intent was to have the jurors infer that Turner's blood at the crime scene – meaning the blood on the street, the drag trail, and the spatter area – was transfered to or spattered onto Mathews and carried with him to the other areas mentions in the argument – the jeans, Mathews' hands, and the tub where Mathews admitted showering. This was not a fair inference in view of what was known about the blood in the tub: that it could not have been Scott **Turner**'s would have supported an inference critical to the defense: that the blood on the ottoman at Linda's home, the blood in the truck that brought Mathews' to his wife's home, and the blood in the bathroom in the wife's home (in other words, the blood along the supposed blood trial that linked Mathews to the crime) was not the victim's blood at all, but was instead Mathews' own blood.

Given the importance of this evidence to the defendant's case, it was ineffective assistance for trial counsel not to have placed this important evidence – that the blood in the tub could not have been Turner's – before the jurors. Mathews' defense was based on the inadequacy of the police investigation and the lack of any forensic evidence tying him to the murder. Trial counsel's failure to alert the jurors to this important exculpatory evidence was ineffec-tiveness under the well know tests of such case law. In that "there was serious incompetency, inefficiency, or inattention of counsel -- behavior ... falling measurably below that which might be expected from an ordinary fallible lawyer" that "deprived this defendant of an otherwise available, substantial ground of defense."

Moreover, the prosecutor's arguing to the jurors that the blood in the tub was inculpatory rather than exculpatory, as the prosecutor must have known, violated Petitioner's right to a fair trial and due process and was error serious enough to warrant a new trial.

-2-

A prosecutor may not ugre the jurors that to draw inferences that are unsupported by the evidence. "Prosecutors must limit the scope of their arguments to facts in evidence and inferences that may be reasonably drawn from the evidence." Further, a prosecutor may not argue or suggest facts not introduced in evidence. Here, the prosecutor's argument ran afoul of this rule.

Whether prosecutorial error requires that a case be retried depends on several factors, including: whether the defendant seasonably objected to the argument; whether the prosecutor's error was linited to "collateral issues" or went to the heat of the defense; whether the judge's instructions may have mitigated the error; and whether the error, in the circumstances of the case, may have made a difference in the jury's verdict.

It is true that defense counsel did not object to the argument. On the other hand , the prosecutor's error cannot be said to have touched only on a collateral matter. As the SJC recognized, the defense was based heavily on the inadequacies of the forensic investigation and the lack of the physical evidence. Because this was the foundation of the defense, the argument suggesting that the blood in the tub belonged to the victim went to the heart of the defendant's case.

In regard to whether the error was likely to have affected the outcome of the trial, this determination must be made by "[v]iewing the prosecutor's closing argument in the context of the trial as a whole." An error in the prosecutor's closing is particularly likely to affect the trial's outcome where, as here, the evidence against the defendant was not overwhelming.

Mathews did not raise this issue in his first motion for a new trial. However, review is required even for waived claims "in order to determine whether any error created a substantial risk of a miscarriage of justice." For all of the reasons stated, defense counsel's omission and the error in the prosecutor's closing created a substantial risk of injustice here, Habeas relief must be granted.

**B.    THE PROSECUTION'S FAILURE TO PERFORM POTENTIALLY EXCULPATORY FORENSIC TESTING AND DEFENSE COUNSEL'S FAILURE TO REQUEST THE TESTING GAVE RAISE TO A SUBSTANTIAL RISK OF A MISCARRIAGE OF JUSTICE**

Detective Lieutenant Martin was permitted to offer expert testimony regarding reconstruction of the crime scene. He testified that it appeared that Turner was lying on the ground during the beating, and that blood was projecting outward from Turner's head as he was beaten on the ground. He further testified that there was a blood "viod" in the bloodstain pattern. Martin explained that something was present that blocked some of the blood as it was projecting outward from the source.

Despite these findings, no testing of any knid was performed on two pairs of shoes recovered from Mathews's wife's home on the morning of Mathews's arrest. Matherws did not live at the wife's home and states that he had only the shoes on his feet when he arrived there on the morning of his arrest. Mathews's wife (soon to be ex-wife) has submitted an affidavit stating that Mathews had no other shoes stored at her home. Police seized the shoes that Mathews had beside him as he was sleeping in a chair before police arrived. A second pair of shoes was seized as well, although the reports do not explain why. In any case, the laboratory reports indicate that no testing was done on either pair of shoes.

Nor does it appear that the shoes were compared to castings of shoe prints done at the crime scene. Lieutenant Martin testified that a casting of a foot-wear impression was taken at the crime scene. In addition, a photograph of a footwear impression was taken at the scene. Since the shoes seixed from Mathews were not examined, it is fair to conclude that they were not compared with the photographs or the cast. [Although the testimony refers to one casting of a shoe or footprint, two castings are shown in the crime scene photographs.]

As stated, the defense relied in significant part on the inadequacy of the police investigation, and in particular the inadequacy of the foremsic testing.

-4-

Given this theme of the defense, the government's failure to test the shoes was significant. And, although defense counsel did not request that the shoes be tested, the failure to test them, and the failure of counsel to challenge the government's omission in this regard gives rise to a substantial risk of a miscarriage of justice.

It is reasonable to infer that counsel's failure to request additional forensic testing was a strategic or tactical decision. In addition, trial counsel in this case has provided present counsel with a letter stating that he does not recall whether he had any tactical reason for not requesting testing on the shoes. However, there is no reason for his failure to do so, particularly since he would not be required to share the results of such testing with the prosecution unless he intended to use the result at trial.

With his motion for a new trial, Mathews filed a motion for discovery. Among other things, he asked that a pair of shoes seized from the area next to the chair where he was sleeping when arrested by the police on the morning of the homicide be tested, at least by screening method, for blood. Because the crime scene was so bloody, it is remarkable that investigators were unable to link Mathews to the crime scene by forensic testing, despite the fact that he was arrested within hours of the homicide. Given the investigator's description of a "viod" in the blood spatter at the crime scene (indicating that some person or thing blocked an area of spatter), as well as the testimony that the blood was blood projecting outward close to the ground, it stands to reason that the person responsible for the killing would have some detectable amount of blood on his shoes. The failure to test the shoes is a glaring omission that could be cured with minimum effort or expense, and the trial judge's refusal to allow it is a new and substantial issue worthy, in the interest of justice, or review. Habeas Corpus relief must be granted on this issue, as well as a complete evidentiary hearing addressing all other issues of items not tested for DNA.

-5-

For the Court's information these two presented grounds have not been presented to State Court as of yet, we are requesting that this information vital as it is, allows this Court to stay the Petition until these arguments can be argued in state court on a Motion for New Trail.


GROUND FIVE (A) constitutes an issue concerning ineffective assistance of counsel for counsel failing to bring forward a defense, in which he had three potential witnesses, to bring forward, that the victim was killed by a jealous boyfriend, of one of the three potential witnesses. This was a close knit group of friends, when the victim (Turner) got out of prison he was intorduced to these group of friends through his sister. The victim and Lisa Brundage became lovers, and had an intimate affair, to the dislike of her then boyfriend, to be named either upon court request, or in either a motion for new trial or evidentiary hearing by this court. Once this boyfriend found out about this intimate affair he became enraged, he beat upon Lisa Brundage and threatened to kill the victim, Petitioner now has three affidavits concerning this potential argument, that supports this third party defense. There are some records that show this party may have had blood on him after the killing of this victim. All of this information was available to both trial, appellate counsel and post-conviction counsel, Petitioner believes because CPCS handeled all three representations of this Petitioner that this issue was not investigated further due to a conflict of interest within CPCS, that counsel outside of CPCS should have been retained by CPCS because Petitioner is indigent and investigated further. After the murder, very soon after, Lisa Brundage and her boyfriend moved completely out of the area. This issue must be investigated further, it was ineffective assistance of all counsel not to fully investigate this issue, and this Petition may have to be stayed until this issue can be more fully prepared and filed in either state or federal court. Exhibit(s) A,B and C are Exhibits of the three witnesses who have come forward with this information and who were ready to testify at trial about this situation and defense.


GROUND FIVE (B) constitutes error by both appellate counsel and post-conviction counsel. When the SJC was reveiwing Petitioner's brief and as 278 33E states a complete review of all the transcripts and information concerning the case because it was a first degree murder case, the transcipts concerning the issue of DNA were defective. The transcipts simply put were incorrect. In Exhibit D, pages 532 through 544 use the word inclusive nine times to describe DNA evidence, this was error of the transcripts. The actual new transcipts that were furnished and corrected by the transcriber after the error was pointed out to him by the Petitioner. The word was not to be inclusive but inconclusive, which is a completely different meaning. This concerned DNA evidence that was used against the Petitioner at trial. Exhibit E, pages 534 through 545 and page 614 show the corrected error. This issue was brought up to appellate counsel and Petitioner was told by appellate counsel he was reading the transcripts wrong, he has letters to prove this, the issue was brought up to post-conviction counsel and was told thats not important. How can it not be important, when the word inclusive is used where inconclusive should have been used concerning DNA evidence that was used to convict the Petitioner. Again this shows a potential conflict of interest by using the same attorney's from CPCS.

-1-

Nither of these two issues were persued in state court because counsel
at the time, either did not fully investigate the issue or told the Petitioner
that he was reading the trascripts wrong. These issues need to be persued, and
since Petitioner has had so much trouble in state court getting counsel to
investigate these issues maybe the best plan of attck on these issues is
to appoint counsel in federal court, let this counsel investigate these two
issues and have them heard at an evidentiary hearing, so that the truth
concerning these issues may finally come out. Because CPCS surely does not
want to investigate these issues on behalf of this Petitioner. Upon the Courts
request he will gladly furnish this court with letters from him to counsel,
and letters from counsel to him showing that these issues will not be inves-
tigated or that Petitioner was reading the transcripts wrong. At the very
least this Petition should be stayed and allow Peitioner to persue these
issues himself in state court in a motion for new trial, but with his limited
legal ability, these issues should be persued in Federal Court.

-2-

AO 241
(Rev 12/04)

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?   ☐ Yes   ☒ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

    Ground Five Issue A and B

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them:

    SeeAttached Sheets pages 1 and 2 of Ground Five A and B

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?   ☐ Yes   ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court. either state or federal, for the judgment you are challenging?   ☐ Yes   ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the raised.

AO 241
(Rev. 12/04)

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing:    J. Drew Segadelli, 530 Main Street
                                Falmouth, MA 02540

(b) At arraignment and plea:

                                J. Drew Segadelli, 530 Main Street
                                   Falmouth, MA 02540

(c) At trial:                   J. Drew Segadelli

(d) At sentencing:              J. Drew Segadelli

(e) On appeal:                  Stewart T. Graham, Jr., 39 Burleigh Rd.
                                Hampden, MA 01036

(f) In any post-conviction proceeding:

                                Leslie W. O'Brien, P.O. Box 426
                                Winchester, MA 01890

(g) On appeal from any ruling against you in a post-conviction proceeding:

                                Leslie W. O'Brien

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?          ☐  Yes    ☒  No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?               ☐  Yes    ☐  No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241
(Rev. 12/04)

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

   (A)    the date on which the judgment became final by the conclusion of direct review or the expiration
of the time for seeking such review;

   (B)    the date on which the impediment to filing an application created by State action in violation of
the Constitution or laws of the United States is removed, if the applicant was prevented from
filing by such state action;

   (C)    the date on which the constitutional right asserted was initially recognized by the Supreme
Court, if the right has been newly recognized by the Supreme Court and made retroactively
applicable to cases on collateral review; or

   (D)    the date on which the factual predicate of the claim or claims presented could have been
discovered through the exercise of due diligence.

AO 241
(Rev. 12/04)

(2)    The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for
Writ of Habeas Corpus was placed in the prison mailing system on   12/21/09   (month, date, year).

Executed (signed) on   12/21/09   (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

IN FORMA PAUPERIS DECLARATION

_____

[insert appropriate court]

* * * * *