# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|                          |     |                        |
|--------------------------|-----|------------------------|
| **LOUIS H. MATHEWS,**    | )   |                        |
|                          | )   |                        |
| **Petitioner,**          | )   | **Civil Action No.**   |
|                          | )   | **09-12200-FDS**       |
| **v.**                   | )   |                        |
|                          | )   |                        |
| **STEVEN SILVA,**        | )   |                        |
|                          | )   |                        |
| **Respondent.**          | )   |                        |

_____)

## MEMORANDUM AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is a *pro se* petition for a writ of habeas corpus by a prisoner in state custody.
Petitioner Louis Mathews is an inmate at Massachusetts Correctional Institution – Norfolk
("MCI Norfolk").  Respondent Steven Silva is the current superintendent at MCI Norfolk.[1]

Mathews was convicted of first-degree murder in December 2005 for the killing of Scott
Turner.  The Massachusetts Supreme Judicial Court ("SJC") denied his appeal in March 2008,
and a single justice of the SJC denied his appeal concerning a motion for new trial in May 2009.

In December 2009, Mathews filed this petition for a writ for habeas corpus under 28
U.S.C. § 2254, alleging ineffective assistance of counsel, among other things.  For the reasons
set forth below, the petition will be denied.

---

[1] The suit was originally filed against Gary Roden, then the superintendent of MCI Norfolk.  Steven Silva
is the current superintendent.  The Court has substituted the correct officer pursuant to Fed. R. Civ. P. 25(d).

I.     **Background**

A.     **Events of June 22-23, 2004**

The following facts are taken from the opinion of the SJC except where otherwise noted.

*See Commonwealth v. Mathews*, 450 Mass. 858, 858-865 (2008).

In June 2004, Scott Turner lived with his sister Linda at 181 Ninigret Avenue in

Mashpee.[2]  On June 22, Linda decided to host a cookout for a few friends.  Among those invited

was Louis Mathews, Linda's former boyfriend.  Turner had known Mathews for only a short

time, but the two had become close, and so he called Mathews to invite him to the cookout.  *Id.*

at 859.

Mathews arrived at the cookout between 10 a.m. and noon.  After his arrival, those in

attendance began drinking vodka and beer.  They continued to do so for the rest of the day, and

the party continued into the evening.  By 9:30 p.m., the crowd had dwindled to Mathews, Turner,

Linda, and Linda's boyfriend, Wayne Dougherty.  *Id.*

Around that time, Mathews and Turner left to walk to Dino's, a local sports bar.

Meanwhile, Linda and Dougherty headed to bed.  Mathews was wearing a pair of red shorts

when he left the house.  At Dino's, Mathews introduced Turner to the bartender as his friend.

They sat at the bar, ordered beer and shots of bourbon, and seemed to be having a good time.  *Id.*

at 859-60.

Just after midnight, the bartender saw Mathews and Turner leave to walk back to 181

Ninigret Avenue.  Both had consumed a large amount of alcohol.[3]  At some point during their

---

[2] For the sake of brevity, the Court will refer to Scott Turner as Turner and his sister as Linda.

[3] "A test of Scott Turner's blood the next morning revealed a blood alcohol level of .33 percent, more than four times the legal limit for driving an automobile."  *Mathews*, 450 Mass. at 860 n.2.  The SJC observed that the trial judge "fully and properly instructed the jury with respect to their consideration of evidence that Mathews was intoxicated at the time he allegedly killed [Turner]."  *Id.*

walk, they became involved in a heated discussion.  Several witnesses reported seeing two men fitting their descriptions arguing as they walked along Ninigret Avenue around 1 a.m.  *Id.* at 860.

When Mathews arrived back at 181 Ninigret Avenue, he was agitated and excited.  He opened the door to the room where Linda and Dougherty were sleeping three times, yelling and slamming it shut each time.  He shouted, alternatively:  "I need your help"; "I'm going to . . . kill your brother"; and "He's trying to leave me."  Linda dismissed his shouting as drunken bluster and went back to sleep.  *Id.* at 860-61.

Turner's body was found at approximately 6:40 a.m. on June 23 by a neighbor at 152 Ninigret Avenue.  Turner had suffered severe trauma to his head and face.  Bloodstains located by investigators indicated that he had been dragged from an area closer to 181 Ninigret Avenue.  Blood spatter evidence suggested that he had been struck with a club-like instrument several times, including while he was lying on the ground.  *Id.* at 861.

A bloodstained tree branch was eventually found in the woods near 181 Ninigret Avenue.  DNA testing revealed that the blood on it was Turner's, which led police to conclude that it was the murder weapon.  An autopsy revealed numerous fractures of Turner's head and face, which were caused by ten or more blows to his head with the branch.  The cause of death was later determined to be blunt trauma to the head and face.  *Id.*

Linda had awoken around 4 a.m. on the morning of June 23 to use the bathroom.  She found Mathews in her living room.  When she asked where Turner was, Mathew told her that "he must have got lucky; he left with two Jamaicans and some girl."  Linda went back to bed.  When she woke again around 6 a.m., Mathews was still in her living room.  He began pacing back and forth, muttering, "got to go, got to go."  At 7:00 a.m., Linda's boss arrived to drive her to work, and Mathews asked for a ride across town.  Linda and her boss noticed that Mathews had dried

blood on his face and a recently opened scab on the bridge of his nose. *Id.* at 861-62.

They drove past the crime scene at 152 Ninigret Avenue. As they did, Mathews took a quick look at the scene and then shielded his face. This caught the attention of a police officer, who noted the license plate number of the car. *Id.* at 862.

Linda and her boss dropped Mathews off at the home of his ex-wife and her housemate, Shannon Price. Price saw Mathews enter and go into the bathroom. She noted that he was acting strangely and saw him leaning over the bathtub, rinsing out some red clothing. Police officers later found the red shorts Mathews had worn the night before, wet and in a pile of dirty clothes. *Id.* at 862, 862 n.4.

Meanwhile, back at the crime scene, police continued their investigation. Wayne Dougherty, Linda's boyfriend, noticed the scene on his way to work and stopped to talk to the officers. The police noticed two red spots on his t-shirt, and with his consent, they took it for testing. *Id.* at 862.

Later that morning, Mathews was taken into custody on an unrelated charge. He was given *Miranda* warnings, which he waived, and agreed to speak with two police officers, Trooper Cosgrove and Detective Waterfield. He told them that he and Turner had left Dino's separately, and that he arrived back at 181 Ninigret Avenue around 11:30 p.m., where he fell asleep watching television. According to Mathews, he later awoke when Turner returned to the house and asked him for money. Mathews refused, at which point Turner became angry and "shoved" him in the back. Mathews admitted yelling into Linda's room about wanting to kill Turner, but claimed that Turner then left as a passenger in an automobile, perhaps with a "girl from Dino's." He did not mention any "Jamaicans." *Id.* at 862-63.

**B.     The Indictment and Trial**

On August 31, 2004, a Barnstable County grand jury was considering whether to indict

4

Mathews for Turner's murder. Trooper Cosgrove and Detective Waterfield, the two police officers who had interviewed Mathews, testified before the grand jury. Each testified about his involvement in the murder investigation, including their conclusion that Mathews was the last person seen with the victim. Waterfield testified that Mathews had told them that he had been with Turner in the hours before the murder and had admitted telling Linda that he was "going to . . . kill" her brother. Waterfield then testified that after he and Cosgrove told Mathews they knew something had happened between Mathews and Turner the night before, Mathews responded by invoking his right to silence and saying that "he needed to talk to a lawyer." The prosecutor immediately said, "[w]ell, just strike that part of it," and later clarified that Mathews was "within his rights not to proceed with the interview and . . . to request a lawyer." The grand jury returned an indictment charging Mathews with murder in the first degree by reason of extreme atrocity and cruelty. *Id.* at 873-74.

The case was tried to a jury in Barnstable County in November and December 2005. (Resp't Supp. Answer ("RSA"), Ex. A). At the trial, the Commonwealth presented testimony from a crime-scene investigator employed by the state-police crime laboratory. He testified as to the results of several orthotolidine tests, which are screening tests to determine whether blood is present in or on a given substance. The crime-scene investigator testified that blood was present in several areas where Linda had seen Mathews sit; around the bathtub where Price had seen Mathews washing clothing; and on Mathews's hands.[4] Defense counsel responded to that testimony by questioning the significance of orthotolidine testing and characterizing it as "a dinosaur" of a test and only "a good first step" towards a complete forensic investigation.

---

[4] Notably, DNA testing of the blood around the bathtub revealed that while Mathews was a major contributor, it could not have come from Turner. (RSA, Ex. H at 7-8, Appendix at 7). According to Mathews, that information was not introduced at trial. (*Id.*).

*Mathews*, 450 Mass. at 863-64.

The Commonwealth also introduced testimony by a DNA chemist employed by the state-police crime laboratory. The chemist testified as to the results of several DNA tests on various blood samples collected by the police. Most of the results were inconclusive.[5] For example, the result of the test comparing DNA from the blood found on Mathews's red shorts to his DNA and Turner's DNA was inconclusive. Similarly, blood on the murder weapon was matched to Turner's DNA, but the chemist was unable to obtain a DNA profile from the other end of the branch, which presumably was used as a handle. DNA tests of swabs from both Mathews's and Turner's hands yielded mixtures of DNA from various sources, but in each case the major contributor was the person whose hand was tested. However, DNA tests suggested a potential match between blood found on Turner's hands and the blood spots on Dougherty's t-shirt. On cross-examination, defense counsel emphasized the failure of the DNA tests to link Turner and Mathews. *Id.* at 864-65.

In their closing arguments, both defense counsel and the prosecutor referred to the DNA evidence. Defense counsel argued that the DNA evidence had not linked Mathews to Turner and pointed out that one of the DNA profiles from Turner's hands had come from another source. The prosecutor responded that "the DNA did not exclude Scott Turner as possibly a potential contributor to the DNA on [Mathews's] hands. They simply said there wasn't enough there to confirm that." *Id.* at 865.

On December 2, 2005, Mathews was convicted of first-degree murder by extreme atrocity or cruelty and sentenced to life in prison. (RSA, Ex. A). He timely appealed. (*Id.*).

---

[5] "In the transcript of her testimony, the State chemist uses the terms 'inclusive' and 'inconclusive' apparently to mean the same thing." *Mathews*, 450 Mass. at 864 n.8.

C.       **First Motion for New Trial**

On May 24, 2006, Mathews filed a motion for new trial in the SJC under Mass. Gen. Laws ch. 278, § 33E.  That motion raised four claims:  (1) the Commonwealth improperly advised the grand jury of Mathews's invocation of his rights to remain silent and to an attorney in violation of the Massachusetts and federal constitutions; (2) the Commonwealth knowingly provided false and deceptive evidence to the grand jury; (3) the Commonwealth withheld exculpatory evidence that would likely have affected the grand jury's decision; and (4) the failure to move to dismiss the indictments of the grand jury constituted ineffective assistance of counsel.  (RSA, Ex. B).  The SJC remanded the motion to the Superior Court and ordered that any appeal be consolidated with Mathews's appeal of his conviction.  (RSA, Ex. A).  The Superior Court then denied the motion and he filed a consolidated appeal to the SJC.  (*Id.*).

Mathews's appeal to the SJC raised three issues:  (1) whether the introduction of inconclusive DNA evidence in an attempt to link him to the murder was prejudicial error constituting a substantial miscarriage of justice, and whether his lawyer's failure to object to that evidence was ineffective assistance of counsel; (2) whether his counsel was ineffective for failing to move to dismiss the indictments; and (3) whether his counsel was ineffective for failing to move to suppress a custodial statement made without the benefit of *Miranda* warnings.  (RSA, Ex. E).

On March 21, 2008, the SJC affirmed the conviction and the Superior Court's order denying his motion for a new trial.  *See Mathews*, 450 Mass. at 859.

D.       **Second Motion for New Trial and Motion for Leave to Appeal under Mass. Gen. Laws ch. 278, § 33E**

On March 10, 2009, Mathews filed a second motion for new trial in the Barnstable Superior Court.  That motion raised two claims:  (1) the failure of both the prosecution and

defense to present evidence that proved the blood identified near the bathtub drain at the home of Mathews's ex-wife could not have come from Turner, and the prosecutor's implication that Turner was the source of the blood, gave rise to a substantial risk of a miscarriage of justice; and (2) the prosecutor's failure to perform potentially exculpatory forensic testing and defense counsel's failure to request such testing gave rise to a substantial risk of a miscarriage of justice. (RSA, Ex. H). On May 27, 2009, the Superior Court denied the motion. (RSA, Ex. A).

Mathews applied for leave to appeal under Mass. Gen. Laws ch. 278, § 33E. (*See generally* RSA, Ex. J). On October 19, 2009, a single justice of the SJC denied the application. (RSA, Ex. A).

### E.   <u>Federal Proceedings</u>

On December 28, 2009, Mathews filed this petition for a writ of habeas corpus. The petition originally raised five claims: (1) the introduction of inconclusive DNA evidence was prejudicial error and a substantial likelihood of a miscarriage of justice, and his lawyer's failure to object to that evidence was ineffective assistance of counsel; (2) ineffective assistance of counsel for failing to move to dismiss the indictments; (3) ineffective assistance of counsel for failing to move to suppress a custodial statement given without *Miranda* warnings; (4) prosecutorial misconduct, giving rise to a substantial likelihood of a miscarriage of justice, in the prosecutor's closing argument; and (5) ineffective assistance of trial counsel for failing to bring forward a defense, and ineffective assistance of post-conviction and appellate counsel for failing to correct the state chemist's statements in trial transcripts that described certain DNA results as "inclusive" instead of "inconclusive." (*See* Pet. at 9-13, 16-23, 26-29, 32-38).[6]

---

[6] Because the page and paragraph numbering in the petition is inconsistent, the Court will refer to page numbers as they appear in the petition as filed, including interposed attachments, on the docket.

On March 26, 2010, respondent Gary Roden moved to dismiss the petition based on lack of exhaustion. (*See* Resp't Mot. (Dkt. No. 8)).[7] The petition acknowledged that the fifth ground was not exhausted. (Pet. at 37). Judge Gertner, who was assigned to the case at the time, issued a stay to permit the exhaustion of that ground and ordered Mathews to submit proof of exhaustion of the claim by September 1, 2011. Mathews, however, failed to do so.

The case was eventually transferred to the undersigned judge. On January 31, 2019, after an extensive series of status conferences and reports, this Court lifted the stay because unexhausted claims had not been addressed in the state courts despite more than eight years of litigation.[8] The Court ordered Mathews to elect by February 28, 2019—later extended to July 15, 2019—whether he intended to proceed with only his exhausted claims or dismiss the entire petition. On July 15, 2019, Mathews filed a document indicating his intention to proceed only on the exhausted claims. (Am. Pet. (Dkt. No. 102)).

## II.    Analysis

### A.    Whether Petitioner's Claims Have Been Procedurally Defaulted

The initial question before the Court is whether petitioner's four remaining claims have been procedurally defaulted. It is undisputed that two of the ineffective-assistance claims raised in the petition have not.[9] However, respondent contends that the other two claims have been so defaulted.

#### 1.    The Procedural-Default Rule Generally

"A federal court generally will not review a § 2254 habeas claim when the state court's

---

[7] At the time, Gary Roden was the superintendent of MCI Norfolk.

[8] Mathews filed a motion for relief from judgment under Fed. R. Civ. P. 60 with respect to the lifting of the stay, which the Court denied. *See generally Mathews v. Silva*, 2019 WL 4573641 (D. Mass. Sep. 20, 2019).

[9] As set forth above, the ineffective-assistance claims set forth in the fifth ground for relief raised by the petition have not been exhausted in state court and were dismissed by petitioner.

decision for that claim rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Powell v. Tompkins*, 783 F.3d 332, 344 (1st Cir. 2015) (citing *Martinez v. Ryan*, 566 U.S. 1, 8-9 (2012)). That rule extends to situations "'when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'" *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991)). A state procedural rule is "adequate" if it is regularly and consistently applied by the state courts. *Hodge v. Mendonsa*, 739 F.3d 34, 43-44 (1st Cir. 2013) (citing *Lee v. Kemna*, 534 U.S. 362, 376 (2002)). The rule is "independent" if it does not depend on a federal constitutional ruling. *See Coleman*, 501 U.S. at 729. The doctrine may apply even where the state procedural default is offered as an "alternative" basis for a decision. *Id.* at 734-35.

In cases involving such a procedural default, "federal habeas review of the claim[] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In this context, "cause must relate to an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule. Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense is insufficient to constitute cause." *Burks v. Dubois*, 55 F.3d 712, 716-17 (1st Cir. 1995) (citations omitted).

### 2. The Massachusetts Contemporaneous-Objection Rule

Respondent first contends that petitioner's claim concerning the admission of inconclusive DNA evidence has been procedurally defaulted. Specifically, respondent contends that the SJC's disposal of that claim based on petitioner's failure to comply with the Massachusetts contemporaneous-objection rule constituted an adequate and independent state-

law ground that bars federal habeas relief.

The Massachusetts contemporaneous-objection rule, codified at Mass. R. Crim. P. 22, "requires that an objection be made at the time of the challenged action." *Brewer v. Marshall*, 119 F.3d 993, 1002 (1st Cir. 1997); *see also Tart v. Massachusetts*, 949 F.2d 490, 496 (1st Cir. 1991) (explaining that under Mass. R. Crim. P. 24(b), "an objection to a jury instruction must be made before the jury retires to deliberate"). The purpose of the rule "is to ensure that the alleged error is brought clearly to the judge's attention so that she may squarely consider and decide the question." *Brewer*, 119 F.3d at 1002 (internal quotations omitted).

The First Circuit has "held, with a regularity bordering on the monotonous, that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." *Hodge*, 739 F.3d at 44 (quoting *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010)). Where, as here, no objection is raised at trial, a Massachusetts appellate court will look only to see whether a "miscarriage of justice" has occurred. *See Burks*, 55 F.3d at 716 n.2.

"This discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule." *Janosky*, 594 F.3d at 44. A federal court should "not infer waiver of a contemporaneous objection rule unless the state appellate court has made it reasonably clear that its reasons for affirming a conviction rest upon its view of federal law." *Tart*, 949 F.2d at 496 (internal quotations omitted).

Here, petitioner's claim regarding inconclusive DNA evidence has two parts: (1) that his trial counsel's failure to object to it constituted ineffective assistance of counsel, and (2) its admission was prejudicial error constituting a substantial likelihood of a miscarriage of justice.

The first part of this claim has not been procedurally defaulted. A criminal defendant

cannot waive an ineffective-assistance claim by failing to object contemporaneously to the competence of her lawyer. *Cf. Commonwealth v. Zinser*, 446 Mass. 807, 810 (2006) (calling it a "well-established principle" that the "preferred method" for raising ineffective-assistance claims is by a motion for a new trial). Accordingly, the SJC disposed of petitioner's ineffective-assistance claim concerning the admission of inconclusive DNA evidence on the merits. *See Mathews*, 450 Mass. at 866-870.[10]

As for the second part of the claim, it appears questionable whether it arises under federal law. Petitioner's contention is that "[t]he introduction of inconclusive DNA evidence in an attempt to link the defendant to the murder was prejudicial error constituting a substantial likelihood of a miscarriage of justice . . . ." (Pet. at 9). That seems to raise a question of state evidentiary law coupled with a recitation of the standard of appellate review for when a defendant has failed to contemporaneously object. While it is conceivable that such a question could implicate the Due Process Clause of the Fourteenth Amendment, the petition contained no indication of that—indeed, it did not refer to any federal statute, case, or constitutional provision. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denies him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Conningford v. Rhode Island*, 640 F.3d 478, 483 (1st Cir. 2011). Accordingly, it appears that when the SJC considered the claim, it interpreted it as one raising state-law issues. *See Mathews*, 450 Mass. at 870-72.

---

[10] Respondent contends that this ineffective-assistance claim was procedurally defaulted when the trial judge denied petitioner's second motion for a new trial on May 27, 2009. However, it does not appear that the claim was presented in that motion. (*See* RSA, Ex. H). Even if it was, it is not clear that the trial judge denied that motion on procedural grounds, rather than on the merits. (*See* RSA, Ex. A).

Moreover, even assuming the claim is based on federal law, it has been procedurally defaulted under the Massachusetts contemporaneous-objection rule. The SJC began its analysis of whether the admission of inconclusive DNA evidence was prejudicial error by observing that petitioner's trial counsel "did not object to the introduction of that evidence." *Mathews*, 450 Mass. at 866. Nevertheless, it went on to conclude that on the merits, the evidence was admissible under the court's prior decisions on the use of DNA evidence. *Id.* at 870-72. However, while the court evaluated that claim on the merits, it did so under state law. *See id.* That is insufficient to infer a waiver of the Massachusetts contemporaneous-objection rule. *See Tart*, 949 F.2d at 496. Therefore, the second part of petitioner's claim regarding inconclusive DNA evidence has been procedurally defaulted.

A procedural default may be overcome if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Neither showing has been made here. Petitioner's only asserted cause for the default is his claim for ineffective assistance of counsel, which fails for the reasons set forth below. And he has not demonstrated that a fundamental miscarriage of justice will result.

Accordingly, petitioner's claim that the admission of inconclusive DNA evidence was prejudicial error constituting a substantial likelihood of a miscarriage of justice is barred by the procedural-default rule.

### 3. Mass. Gen. Laws ch. 278, § 33E

Second, respondent contends that the claims raised in the fourth ground for relief—that both defense counsel and the prosecutor failed to present potentially exculpatory details about blood evidence and to further explore other evidence—were also procedurally defaulted. Specifically, respondent contends those claims were procedurally defaulted when a single

'gatekeeper' justice of the SJC denied petitioner's application under Mass. Gen. Laws ch. 278, §33E.

Chapter 278, § 33E provides for a direct appeal to the SJC in so-called "capital" cases (essentially, first-degree murder convictions). Under Massachusetts law, § 33E provides for "a distinct process of review by the [SJC]." *Mendes v. Brady*, 656 F.3d 126, 128 (1st Cir. 2011). The First Circuit has described that process as follows:

> According to the scheme set forth in that statute, a defendant who has been convicted of first-degree murder is afforded plenary review on direct appeal to the SJC. Following such review, a defendant is free to file any number of motions for a new trial in state superior court. He is only entitled to appellate review of the denial of such a motion, however, if a single justice of the SJC determines that the appeal presents a question that is both new and substantial, fit for resolution by the full court, or if it nevertheless raises the specter of a substantial risk of a miscarriage of justice

*Lee v. Corsini*, 777 F.3d 46, 55 (1st Cir. 2015) (citations and quotations omitted).

Whether the denial of a § 33E application constitutes a procedural default depends on whether the reason for the denial was that the issues were not new or not substantial. "The single justice's determination that an issue is not new within the meaning of § 33E is tantamount to a finding of procedural default," but "a determination that the issues are new and simply not substantial resolves the claims on the merits and does not signal procedural default." *Lee*, 777 F.3d at 55 (internal quotations omitted). "Thus, 'it is only the failure to satisfy the new prong of the § 33E rule that signals procedural default.'" *Yacouba-Issa v. Calis*, 2019 WL 1332922, at *12 (D. Mass. Mar. 25, 2019) (internal quotations omitted) (quoting *Lee*, 777 F.3d at 57).

"Under Massachusetts law, a claim is not 'new' within the meaning of § 33E 'where it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review.'" *Hart v. MCI Concord Superintendent*, 36 F. Supp. 3d 186, 197 (D. Mass. 2014) (quoting *Commonwealth v. Gunter*, 459 Mass. 480, 487 (2011)).

Here, the gatekeeper justice gave no guidance as to why petitioner's claims were 'not new,' 'not substantial,' or both. The Court will therefore look to the record to determine the facts and procedural underpinnings of the ruling.

The claims at issue were not previously addressed at petitioner's trial or in his consolidated appeal. The SJC rejected petitioner's claim that the prosecutor should have presented some potentially exculpatory DNA evidence, but it did not consider the evidence at issue here: the blood near the bathtub drain at the home of Mathews's ex-wife. (*See* Pet. at 32-33). *See Mathews*, 450 Mass. at 876-77. Nor did it consider his contention that the prosecutor misrepresented the source of that blood. And it did not discuss the other forensic tests, which concerned his shoes, that he says the prosecutor and defense counsel should have conducted.

However, it appears that these claims could have been addressed had petitioner properly raised them at trial or on direct review. The DNA evidence about the blood near the bathtub drain, which he says was potentially exculpatory, was revealed in a November 2, 2004 state crime-laboratory report. (RSA, Ex. J, Appendix at 1, 7). Thus, that evidence—and any error concerning the prosecutor's references to it—was available at the time of trial and the direct appeal.[11] Similarly, it appears that petitioner could have also raised on direct appeal any claims of ineffective-assistance or prosecutorial error about the other forensic tests he says should have been conducted. The evidence he relies upon, such as the state crime-laboratory report and witness testimony, was available to him at the time. (*See* RSA, Ex. J at 17-19). And with respect to his ineffective-assistance claim, there was no issue of structural conflict in the attorney-client relationship that would prevent raising it on direct review, because different

---

[11] While appellate courts normally do not permit the introduction of new evidence and new claims, petitioner could have raised them for the first time in the SJC because he is a "capital" defendant under Mass. Gen. Laws ch. 278, § 33E. *See Mendes*, 656 F.3d at 129; *Hart*, 36 F. Supp. 3d at 199-200.

counsel represented him than at his trial. (*Compare* RSA, Ex. J. at 21 *with* RSA, Ex. J,

Appendix at 14). *See Hart*, 36 F. Supp. 3d at 199.

In short, petitioner could have asserted these claims on direct review. They were not "new" under § 33E, in the sense that petitioner had a prior opportunity to raise the claim on direct appeal but did not. Therefore, he has procedurally defaulted on that claim.

A procedural default may be overcome if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner has shown neither here. At most, the failure to raise the issues in his direct appeal under § 33E was attorney error. "Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense, is insufficient to constitute cause." *Burks*, 55 F.3d at 717 (citations omitted).[12] Nor has petitioner demonstrated that a fundamental miscarriage of justice will result. Accordingly, the claims raised in ground four of his petition are barred by the procedural-default rule.

### B. Whether Petitioner is Entitled to Relief on His Remaining Claims

Petitioner raises three claims of ineffective assistance by his trial counsel. He contends that the performance of his trial counsel was deficient because his lawyer failed (1) to object to the admission of inconclusive DNA evidence; (2) to move to dismiss the indictment; or (3) to move to suppress his custodial statements.

It does not appear that the procedural-default rule bars federal habeas review of any of these claims. The first claim is not procedurally defaulted for the reasons set forth above. And

---

[12] Petitioner has raised several ineffective-assistance claims, but none that would constitute cause for this default. Most of those claims deal with the performance of his trial counsel. The only ineffective-assistance claims he has raised with respect to the performance of his post-conviction and appellate counsel are unrelated to this procedural default and have been dismissed as unexhausted.

respondent does not contend that petitioner has procedurally defaulted on either of the other two claims. Thus, all three will be reviewed on the merits.

### 1.    Standard of Review

If an independent and adequate state-law ground does not preclude review, an application for a writ of habeas corpus brought by a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" may be granted only if those proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, if a claim was not adjudicated on the merits in State court proceedings, then the claim should be reviewed *de novo* by the federal district court. *Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015).

"Section 2254(d) thus demands an inquiry into whether a prisoner's claim has been adjudicated on the merits in state court; if it has, [§ 2254(d)]'s highly deferential standards kick in." *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quotations omitted). To decide a federal claim on the merits, it is not necessary for a state court to explain its reasons in an opinion or to "cite or even be aware of" Supreme Court caselaw. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

### 2.    Whether Petitioner is Entitled to Relief under 28 U.S.C. § 2254(d) on His Claims for Ineffective Assistance of Counsel

#### a.    Standard

Claims for ineffective assistance of counsel under the Sixth Amendment must satisfy the

two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result. *Id.* at 687.

The first prong of the *Strickland* test requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "[T]here is a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (2011) (quoting *Strickland*, 466 U.S. at 689); *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("[C]ounsel's judgments in formulating the defense strategy are entitled to substantial deference."). A petitioner may overcome the presumption by demonstrating that counsel's alleged errors were so serious that his performance "fell below an objective standard of reasonableness under the circumstances." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Strickland*, 466 U.S. at 687-88); *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

The second prong of the *Strickland* test requires a petitioner to show that counsel's deficient performance resulted in "prejudice"—that is, that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was reliable." 466 U.S. at 687. Stated differently, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Sleeper*, 510 F.3d at 39.

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because both standards are "'highly deferential.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). "When §

2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* A petitioner alleging ineffective assistance under § 2254 must not only demonstrate that counsel was ineffective under the *Strickland* standard, but "must also demonstrate that the state court's denial of his claim was objectively unreasonable." *Abrante v. St. Amand*, 595 F.3d 11, 19 (1st Cir. 2010).

### b.     First Ineffective-Assistance Claim

Petitioner's ineffective-assistance claim for his trial counsel's failure to object to inconclusive DNA evidence was adjudicated on the merits.  The SJC evaluated that claim in his consolidated appeal.  *See Mathews*, 450 Mass. at 866-870.  It did so under the standard set forth in Mass. Gen. Laws ch. 278, § 33E, which requires a defendant to show (1) "there was error at trial," and (2) "that error was likely to have influenced the jury's conclusion." *Id.* at 866. Because that analysis mirrors the *Strickland* standard and is "'at least as protective of the defendant's rights as its federal counterpart,'" the SJC's rejection of the claim constitutes an on-the-merits adjudication under 28 U.S.C. § 2254(d).  *Lucien v. Spencer*, 871 F.3d 117, 129 (1st Cir. 2017) (quoting *Kirwan v. Spencer*, 631 F.3d 582, 590 n.3 (1st Cir. 2011)).

The question then becomes whether the SJC's application of the standard was unreasonable.  After a review of the trial record, the SJC found that petitioner's "[t]rial counsel presented a multipart defense on behalf of his client." *Mathews*, 450 Mass. at 866-67.  Counsel criticized the completeness of the Commonwealth's investigation, emphasized the lack of physical or forensic evidence tying petitioner to the murder, and suggested that the victim's sister and her boyfriend "either played a role in the murder or were engaged in a cover-up to protect the true culprit." *Id.* The SJC found it plausible that all three strategies were helped by his decision not to object to the DNA evidence. *Id.* at 867-69.  Accordingly, it concluded that choice

was a "calculated, reasonable, and competent" tactical decision and not deficient performance. *Id.* at 869-870. Furthermore, it also determined that even if defense counsel had objected, the trial court was well within its discretion to admit the evidence. *Id.* at 872. Having found no proof of either deficient performance by petitioner's trial counsel or prejudice, the SJC denied his ineffective-assistance claim. *Id.* at 870, 872.

The SJC's analysis satisfies the constitutional standard. As the SJC found, petitioner's trial counsel could have reasonably concluded that it was better not to object to the DNA evidence and use it for other defense theories than it was to try to have that evidence excluded. That type of tactical decision deserves substantial deference and is not deficient performance under *Strickland*. *See Genius*, 147 F.3d at 66. Moreover, petitioner has not shown any substantial likelihood of prejudice; the SJC found that even if his counsel had objected, the DNA evidence likely would have come in anyway. *Mathews*, 450 Mass. at 872. At a minimum, the SJC's conclusion—that the decision by petitioner's trial counsel not to object to the DNA evidence was not ineffective assistance of counsel—was not contrary to or an unreasonable application of Supreme Court precedent. Therefore, petitioner is not entitled to relief on that claim.

### c.     Second Ineffective-Assistance Claim

Petitioner's ineffective-assistance claim arising out of his trial counsel's failure to move to dismiss the indictment was adjudicated on the merits. This claim was also considered by the SJC in his consolidated appeal under the same standard of review as his previous claim. *See id.* at 872-75. The SJC started with the observation that under Massachusetts law, a court will not question the quality of evidence before a grand jury unless "extraordinary circumstances" are present. *Id.* at 873 (citing *Commonwealth v. Freeman*, 407 Mass. 279, 282 (1990)). It found such extraordinary circumstances to be present, because one of the testifying officers had

referred to petitioner's invocation of his right to silence, which "implicates the 'integrity of the grand jury proceedings'. . . ." *Id.* at 874 (quoting *Freeman*, 407 Mass. at 282). But while it found that the officer's reference to "[petitioner's] silence and request for counsel was improper," it concluded that there had been no prejudice because, after reviewing the properly-presented evidence, the SJC found that it "was more than adequate to meet the Commonwealth's burden of probable cause." *Id.* at 875. Therefore, the SJC said, "trial counsel was not ineffective in failing to seek dismissal of the indictment on this ground." *Id.*

Petitioner has not offered any reason why that rejection of his ineffective-assistance claim was based on an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. To the contrary, it appears that the SJC carefully reviewed the record and reasonably concluded that even if the failure by trial counsel to move to dismiss the indictment was deficient performance, it had not resulted in any prejudice to petitioner. As a result, petitioner is not entitled to relief on that claim.

### d.   Third Ineffective-Assistance Claim

Finally, petitioner's ineffective-assistance claim arising out of his counsel's failure to move to suppress a statement he made while in custody was also adjudicated on the merits. That claim, too, was considered by the SJC in his consolidated appeal. *See id.* at 877-878. The SJC first described the basis for petitioner's claim. At some point after he was taken into custody on an unrelated charge, petitioner learned that police wanted to talk to him about "something else," and he responded that he "thought that" or "figured" that to be the case. *Id.* According to the SJC, the issue is that it is not entirely clear whether he made the statement before or after he received and waived his *Miranda* warnings; a police officer testified at trial that it was after, but a police report indicates that it was before. *Id.* In any event, the SJC held that even if petitioner's trial counsel had moved to suppress the statement, he likely would not have

succeeded because the officer would have testified similarly at a suppression hearing. *Id.*[13] Accordingly, the court denied the claim for ineffective assistance of counsel. *Id.*

The SJC's analysis is not an unreasonable application of Supreme Court precedent, nor does it appear to be an unreasonable determination of the facts. It is well-settled that a "counsel's performance was not deficient if he declined to pursue a futile tactic." *Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999). The SJC's determination that any motion to exclude petitioner's custodial statement would have been futile appears grounded in its thorough review of the record. Indeed, petitioner has not taken any issue with that conclusion. Therefore, the SJC's denial of petitioner's third ineffective-assistance claim is also entitled to deference, and petitioner is not entitled to relief on that claim.

## III. <u>Conclusion</u>

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. This matter is accordingly DISMISSED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: April 8, 2020                    Chief Judge, United States District Court

---

[13] Petitioner also contends that his trial counsel should have moved to suppress later statements he made in custody as tainted and inadmissible because his initial comment "let the cat out of the bag." (Pet. at 28-29). But the SJC rejected this motion as futile, too, because—even assuming that petitioner was given his *Miranda* warnings only after his initial statement—the contents of his later statements indicated "that he did not feel as though he had 'nothing more to lose,' because he denied his involvement in the murder throughout the next hour." *Mathews*, 450 Mass. at 878 n.20.